UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JULIE RAADSCHELDERS,

    Plaintiff,

    v.

COLUMBUS STATE
COMMUNITY COLLEGE,

    Defendant.

Case No. 2:17-cv-450
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

## OPINION AND ORDER

This matter is before the Court on Defendant Columbus State Community College's

("Columbus State") *Motion for Summary Judgment* (ECF No. 46), Plaintiff Dr. Julie

Raadschelders' ("Dr. Raadschelders") *Memorandum in Opposition* (ECF No. 49), and Columbus

State's *Reply* (ECF No. 50). For the reasons below, the Court **GRANTS in PART** and **DENIES**

**in PART** Columbus State's *Motion for Summary Judgment*. (ECF No. 46).

### I.

### A. Factual Background

Columbus State is a large community college with three divisions: Arts & Sciences,

Business & Engineering Technology, and Health & Human Services. Cooley Dep. Tr. at 12

(ECF No. 39-1). Each division has a dean, who reports to Senior Vice President of Academic

Affairs Jack Cooley ("Vice President Cooley"). *Id.* Columbus State's Arts & Sciences division

offers associate degrees designed to transfer to four-year institutions. *Id.* at 15. Business &

Engineering and Health & Human Services offer career-based training designed to prepare

graduates for immediate employment; therefore, most courses offered in these divisions do not

transfer to other institutions. *Id.* at 16.

On January 1, 2012, Columbus State hired Dr. Amy Ng ("Dr. Ng") as an instructor in the

Health & Human Services' Criminal Justice Department. Ng Dep. Tr. at 10, 24 (ECF No. 44).

Of the four professors in the Criminal Justice Department, Dr. Ng was the only female. *Id.* at

24–25. Dr. Ng alleges that, during her first semester, two of the three other Criminal Justice

Department professors began harassing and discriminating against her. *Id.* at 28.

By February of 2014, Dr. Ng was unhappy with her work environment and so she

emailed Vice President Cooley to express interest in transferring from the Health & Human

Services' Criminal Justice Department to the Arts & Sciences' Social Sciences Department. *Id.*

at 37–38. Throughout the 2014 Spring semester, the Chair of the Social Sciences Department at

that time, Rebecca Mobley ("Chairwoman Mobley"), communicated with Dr. Ng about

transferring to the Social Sciences Department. *Id.* at 38–39. On May 8, 2014, Chairwoman

Mobley advised Vice President Cooley and Lisa Schneider, Interim Dean of Arts & Sciences

("Dean Schneider"), as follows:

> I just had a conversation with [Dr. Ng], and she expressed that the situation in her
> department has deteriorated significantly. Given that Don Ricker's contract will
> end at the end of this term, we would like to seriously push to have [Dr. Ng]
> moved to our department ASAP. As you know Don taught the bulk of our
> criminology courses, and given Amy's area of expertise she would be able to
> assume these courses while a plan is developed to create 2+2 plans of study for
> students wishing to go into Criminal Justice/Criminology. Our department is
> fully supportive of her move. Is it possible that this could be seriously
> investigated over the summer with a hope that she could be relocated by Autumn,
> if appropriate?

Cooley Dep., Ex. 3 at 1–2. Dean Schneider responded that some of those professors in the

Criminal Justice Department who allegedly harassed Dr. Ng wanted to keep those courses in the

Criminal Justice Department. Schneider Dep., Ex. 3 (ECF No. 40). Referring to those

professors, Vice President Cooley replied that he had "zero interest in protecting the convenience

2

of faculty who put the college at risk due to their behavior." *Id.*; Ng Dep., Ex. 10 at 4. Vice President Cooley then emailed Dean Schneider individually, as follows:

> I want to move forward on this .... I am not overly concerned about the police faculty having courses for their convenience. They made their bed. This is not to say that we shouldn't be concerned that the college makes all necessary courses available to that program. ... I'm just not concerned that [the Criminology courses] be located in [the Criminal Justice Department]. It's a cause and effect world.

Schneider Dep., Ex. 3.

In May of 2014, after obtaining the consent of the Social Sciences Department faculty, Vice President Cooley approved Dr. Ng's transfer from the Criminal Justice Department to the Social Sciences Department. Cooley Dep. Tr. at 53–55, Ex. 3–5; Schneider Dep. Tr. at 62–63. By the time the Social Sciences Department approved Dr. Ng's transfer, she had developed three other courses in the Criminal Justice Department. Ng Dep. Tr. at 63–64. Vice President Cooley testified that, according to the terms of the transfer, Dr. Ng would have a "teach out" period in the Criminal Justice Department and then begin teaching the Criminology courses exclusively through the Social Sciences Department. Cooley Dep. Tr. at 65, Ex. 3–5. Dr. Ng testified that Dean Schneider ensured Dr. Ng that she would have enough courses to teach during Dr. Ng's interim "teach out" period, after which Dr. Ng's courses in the Criminal Justice Department would transfer to the Social Sciences Department. Ng Dep. Tr. at 63–64. The terms of Dr. Ng's transfer were never memorialized in writing. *Id.* at 68. Dr. Ng testifies that the terms were "all discussion-based." *Id.*

In June of 2014, Columbus State hired Dr. Allysen Todd ("Dean Todd") as the Dean of its Arts & Sciences division. Todd Dep. Tr. at 15 (ECF No. 44). On October 1, 2014, Dr. Raadschelders replaced Chairwoman Mobley as the Chair of the Social Sciences Department. *Id.* at 44; Pl.'s Dep. Tr. at 11–13, Ex. B (ECF No. 42). As Chair of the Social Sciences

Department, Dr. Raadschelders reported directly to Dean Todd. Schneider Dep. Tr. at 15; Todd Dep. Tr. at 15. Dean Todd reported directly to Vice President Cooley. *Id.* at 15. Dr. Raadschelders was responsible for: leading the Social Sciences Department in curriculum planning and assessment; facilitating hiring; conducting performance evaluations; overseeing professional development of staff and faculty; managing department resources, including the budget, scheduling, and staffing of classes; and resolving student complaints and personnel issues. Pl.'s Dep. Tr., Ex. D at 2.

On August 6, 2014, Dr. Ng filed an internal sex discrimination and retaliation complaint against Scott Wagner, a former police officer and instructor in the Criminal Justice Department.[1] Ng Dep. Tr. at V.2, Ex. 2. On August 8, 2014, Dr. Ng transferred to the Social Sciences Department. Ng Dep., Ex. 3. Upon transferring to the Social Sciences Department, Dr. Ng was the most junior faculty member. Cooley Dep. Tr. at 87–88; Schneider Dep. Tr. at 149; Ng Dep. Tr. at 22–26, Ex. E. The Social Sciences Department's faculty used a seniority-driven course selection system. Ng Dep., Ex. E.

Dr. Ng was required to teach up to five sections of courses in the Criminal Justice Department during the 2014–15 school year. Ng Dep. Tr. at 83. Within a month of Dr. Ng's transfer from the Criminal Justice Department to the Social Sciences Department, the Criminal Justice Department removed Criminology and Introduction to Sociology courses from its degree program.[2] *Id.* at 86; Cooley Dep. Tr. at 90. Dr. Ng believed that faculty in the Criminal Justice Department removed these courses to retaliate against her for transferring out of the Criminal Justice Department and filing the Title IX complaint against its faculty. Ng Dep. Tr. at 88. Dr.

---

[1] Dr. Ng's internal sex discrimination and retaliation complaint was found to be unsubstantiated. Cooley Dep., Ex. 11.

[2] In 2017, Vice President Cooley learned that these classes were removed. Cooley Dep. Tr. at 44–47. He then immediately ordered the Criminal Justice Department to add it back as a required class. *Id.*

4

Ng told Dr. Raadschelders that she felt the Criminal Justice Department was retaliating against her. Pl. Dep. Tr. at 86. Around the same time, Dr. Karen Muir ("Dr. Muir"), a former Social Sciences Department faculty member who had seniority over Dr. Ng, returned to the Social Sciences Department. Pl.'s Dep. Tr. at 26. The reduced demand for Criminology and Sociology courses, in addition to Dr. Muir's return, further frustrated scheduling issues for Dr. Ng and others in the Social Sciences Department. Schneider Dep. Tr. at 73. To generate more teaching opportunities, Dr. Ng and another Social Sciences Department faculty member applied to teach courses in the Criminal Justice Department. Cooley Dep. Tr. at 99–100, Ex. 13; Ng Dep. Tr. at 28–30. Dean Todd supported Dr. Ng's request. Ng Dep. Tr. at 28–30

On March 24, 2015, Dean Todd directed Dr. Raadschelders to inform Dr. Ng that the Arts & Sciences division needed a transfer pathway in Criminology and that Dr. Ng could develop one course each semester for that purpose. Todd Dep. Tr. at 64, 71, Ex. 11, 16; Pl.'s Dep., Ex. L. Vice President Cooley authorized her to create the Criminology transfer pathway. Todd Dep. Tr. at 65; Cooley Dep. Tr. at 92–93. From March of 2015 to March of 2016, Dr. Ng created two new course proposals for the Social Sciences Department. Ng Dep. Tr. at 99–100. In March of 2016, Social Science Department faculty members expressed concern that Dr. Ng needed to distinguish her proposed courses from the policing and corrections courses offered in the Criminal Justice Department. Pl.'s Dep. Tr. at 21–22, Ex. I. Dr. Ng submitted her course proposals to the Division Curriculum Committee in March of 2016. Ng Dep. Tr. at 106. Thereafter, the Division Curriculum Committee advised Dr. Raadschelders that it would not consider Dr. Ng's course proposals because the paperwork lacked Vice President Cooley's signature, which was required. Pl.'s Dep. Tr. at 45.

On March 17, 2016, Dr. Raadschelders notified Dean Todd of the Division Curriculum Committee's decision regarding Dr. Ng's course proposals. Todd Dep. Tr. at 45; Ex.21. Thereafter, Vice President Cooley received Dr. Ng's course proposals. *Id.* at 125. Vice President Cooley averred that he was surprised because he did not know Dr. Ng had been authorized to develop courses. Cooley Dep. Tr. at 135–36. Upon reviewing the course proposals, Vice President Cooley was concerned about their numbering, which indicated higher-level coursework, and perceived lack of transferability to other institutions. *Id.* at 105. Dean Todd did not share the same concerns and instead advocated for their approval. Cooley Dep., Ex. 15. Vice President Cooley told Dean Todd he would contact his colleagues at other schools for feedback on the course proposals and pause consideration of their approval in the meantime. Cooley Dep. Tr. at 115–16, Ex. 15.

On April 4, 2016, a Social Sciences Department faculty member, Dr. Tracy Little ("Dr. Little"), requested a meeting with Vice President Cooley and Dr. Raadschelders to discuss Vice President Cooley's rationale for pausing consideration of the course proposals. Cooley Dep. Tr. at 132, Ex. 21. In response, Vice President Cooley expressed his willingness to discuss the matter. *Id.* He also made clear his reluctance to add new courses due to the increasing legislative focus on streamlining higher education for affordability and the uncertain demand for the proposed courses. *Id.*

On April 11, 2016, Dr. Raadschelders, Dr. Little, and Vice President Cooley met to discuss the development of Criminology courses for the Social Sciences Department. *Id.* at 137–38. Vice President Cooley reiterated his concerns that Columbus State's Division Curriculum Committee would deny the course proposals because their course numbers indicated upper-level courses and other four-year institutions might not accept them. *Id.* at 138. During the meeting,

6

Dr. Raadschelders grew angry. *Id.* at 139. Vice President Cooley testified that he did not believe Dr. Raadschelders was disrespectful but, based on her tone and raised voice, Vice President Cooley believed she was angered by his skepticism. *Id.* at 140. Dr. Raadschelders' notes from the April 11, 2016 meeting reiterate Vice President Cooley's testimony. Pl.'s Dep., Ex. K. Dr. Raadschelders' notes also mention discussions about Dr. Ng's move and scheduling issues in the Social Sciences Department, stating:

> We asked what we were to do about [Dr. Ng], and [Vice President Cooley] repeated his assurance of guaranteeing her hours for the summer. I asked about the fall and spring and the following summer. [Vice President Cooley] said we would have to wait and see. I said that was unacceptable.
> ....
> As we were leaving, [Dr. Little] mentioned that [Dr. Ng] had been to the Ohio Civil Rights Commission, and I mentioned that [Dr. Ng] would likely be seeking legal counsel. [Vice President Cooley] said that was her prerogative.

*Id.* at 1–2.

After the April 11, 2016 meeting, Vice President Cooley and Dr. Raadschelders never interacted again. Cooley Dep. Tr. at 146. Vice President Cooley testifies that because Dr. Raadschelders had grown angry at the April 11, 2016 meeting, he asked Dean Todd to speak with Dr. Raadschelders about constructively solving the Social Sciences Department's curriculum problems. *Id.* at 140–41. Dean Todd avers that once she learned about Dr. Raadschelders' behavior during the April 11th meeting, she decided that she needed to file a written reprimand for Dr. Raadschelders.[3] Todd Dep. Tr. at 31. Dean Todd then met with Columbus State's Human Resources Department to discuss Dr. Raadschelders' behavior. Todd

---

[3] Dean Todd had already verbally reprimanded Dr. Raadschelders sometime in November of 2015. Todd Dep. Tr. at 32. On that occasion, Dean Todd "told [Dr. Raadschelders] that her comments of dissent about certain initiatives or projects that we, as a division, were to carry out, were not constructive and often created tension in meetings because of their aggressive nature." *Id.* at 32. Dean Todd also explained that although she "recognized that personal opinion can be expressed at the end of the day, [everyone in the Department] had to be in agreement to follow through with what we were asked to do." *Id.* Finally, Dean Todd told Dr. Raadschelders "that she needed to tone down the sharpness of the objections she had and that she needed to be part of the collective agreement that we would move forward as a group." *Id.* at 33.

Dep. Tr. at 30. Dean Schneider and Human Resources Representative Julie Klinger ("HR Rep. Klinger") also met to discuss Dr. Raadschelders' "insubordinate and discourteous" conduct. Schneider Dep. Tr. at 110–11, Ex. 17. After meeting, HR Rep. Klinger sent a written reprimand template to Dean Schneider and Dean Todd to prepare for Dr. Raadschelders. Klinger Dep. Tr. at 87, Ex. 8.

On April 25, 2016, at approximately 9:00 a.m., Dean Todd returned a completed written reprimand to HR Rep. Klinger. Todd Dep. Tr. at 31, 55, Ex. 30. Dean Todd, Dean Schneider, and HR Rep. Klinger planned to issue Dr. Raadschelders the written reprimand at a meeting scheduled for 10:00 a.m. that day. Klinger Dep. Tr. at 87, Ex. 8. No one told Dr. Raadschelders the reason for the meeting. Todd Dep. Tr. at 31, 55; Schneider Dep. Tr. at 119. HR Rep. Klinger did not have enough time to review Dean Todd's draft and told Dean Todd not to issue Dr. Raadschelders the written reprimand at the April 25th meeting. Klinger Dep. Tr. 68, 76; Todd Dep. Tr. 54–55.

At 10:00 a.m., HR Rep. Klinger, Dean Todd, and Dean Schneider met with Dr. Raadschelders. Klinger Dep. Tr. at 87, Ex. 8. Dr. Raadschelders informed Dean Todd, Dean Schneider, and HR Rep. Klinger that she had met with Dr. Ng and explained there was nothing more she could do for Dr. Ng. Pl.'s Dep. Tr. at 50; Schneider Dep., Ex. 25 at 3. Dr. Raadschelders notified Dean Todd, Dean Schneider, and HR Rep. Todd that she had encouraged Dr. Ng to seek help "extra-institutionally," *i.e.*, through the Ohio Civil Rights Commission or by suing Columbus State. *Id.* Dr. Raadschelders also acknowledged her job was at risk and that she did not have faculty protections, such as tenure or union support. Schneider Dep., Ex. 25 at 4. Dr. Raadschelders then suggested to Dean Schneider and Dean Todd that she might disclose

8

damaging information about Columbus State to the Columbus Dispatch. Pl.'s Resp. (citing Schneider Dep. Tr. at 135).

Dr. Raadschelders testified that, after the April 25th meeting, she was in fear of losing her job. Pl.'s Dep. Tr. at 59–60. For that reason, Dr. Raadschelders contacted HR Rep. Klinger. Klinger Dep. Tr. at 62–63. HR Rep. Klinger urged Dr. Raadschelders to let the curriculum matters lapse and told her, "this is not your flag to fly. Let the union handle [Dr. Ng's situation]." Klinger Dep. Tr. at 65–66. Dr. Raadschelders testified that she did not believe the union could help Dr. Ng. Pl.'s Dep. Tr. at 50, 62. Further, Dr. Raadschelders told HR Rep. Klinger that she was justified in her actions, would not accept any discipline, and would hire an attorney. Klinger Dep., Ex. 4 at 3. HR Rep. Klinger assured Dr. Raadschelders that Columbus State had not terminated her and that she could return to work. Klinger Dep. Tr. at 64.

Thereafter, HR Rep. Klinger spoke with Dean Todd. Klinger Dep. Tr. at 51; Pl.'s Dep. Tr. at 60. About that conversation, Dean Todd testified:

> So I said to [HR Rep. Klinger], if [Dr. Raadschelders] were to say, "look, I don't agree with this, the way in which we have to pause over these courses, but now I recognize that I've been given a directive and even though I personally disagree with it, I'm going to move forward as I should, as a chair, as a professional." I was hoping [Dr. Raadschelders] would say that.

Todd Dep. Tr. at 204. HR Rep. Klinger informed Dean Todd that Dr. Raadschelders was disinclined to accept any kind of reprimand because she felt justified in continuing to advocate for Dr. Ng's course proposals. Pl.'s Dep. Tr. at 61–62. Dean Todd then recommended firing Dr. Raadschelders. Todd Dep. Tr. at 206. On May 3, 2016, at Dean Todd's recommendation, Columbus State terminated Dr. Raadschelders. Cooley Dep., Ex. C.

## B. Procedural Background

In Counts One and Two of her Complaint, Dr. Raadschelders alleges that Columbus State terminated her at-will administrative appointment because of her sex, in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq. ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq. ("Title VII"). Pl.'s Compl. at ¶¶ 30–47. In Count Three, Dr. Raadschelders claims that Columbus State retaliatorily discharged her in violation of Title VII. Pl.'s Compl. at ¶¶ 48–55. Columbus State has moved the Court for summary judgment against Dr. Raadschelders on all her claims.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is

10

such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.

### A. Retaliation in Violation of Title VII

Dean Todd offered two reasons for terminating Dr. Raadschelders: insubordination and threatening to hire an attorney. The Sixth Circuit has repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action. *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 Fed. Appx. 336, 340 (6th Cir. 2001) (holding that "documented insubordination constitutes a legitimate nondiscriminatory reason for …firing.")). Dr. Raadschelders contends that she was not insubordinate but rather that she protested Columbus State's illegal treatment of Dr. Ng and was fired for doing so.

Title VII prohibits employers from discriminating against an employee because the employee has opposed any unlawful employment practice, or because the employee has made a charge that the employer has engaged in an unlawful employment practice. 42 U.S.C. § 2000e–3(a). A plaintiff who alleges retaliation in violation of Title VII may establish the claim through direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Dr. Raadschelders contends that she has introduced both direct and circumstantial evidence of retaliation for engaging in a protected activity. Columbus State argues that Dr.

11

Raadschelders has failed to show that she can meet her burden using either method of proof because she did not engage in a protected activity. The Court begins with whether Dr. Raadschelders engaged in protected activity by opposing an employment practice that she reasonably believed was discriminatory because that question is essential to the viability of her retaliation claim.

## 1. Protected Activity

To fall within the protection of Title VII, Dr. Raadschelders must establish that she challenged an employment practice that she reasonably believed was unlawful. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). Title VII does not restrict the manner in which an employee may oppose an unlawful employment practice. *Id.* Title VII does not protect an employee, however, if her opposition is merely a "vague charge of discrimination." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). While vague complaints do not constitute opposition, a plaintiff's complaint need not be "lodged with absolute formality, clarity, or precision." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 Fed. Appx. 624, 631 (6th Cir. 2013). "A plaintiff's objection to an employment practice is protected activity if her supervisors should have reasonably understood that she was making a complaint of [] discrimination." *Mumm v. Charter Township of Superior*, 727 Fed. Appx. 110, 112 (6th Cir. 2018) (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016)) (internal quotations omitted). "That means a complaint must allege unlawful discrimination rather than general unfairness." *Id.*

Columbus State argues that Dr. Raadschelders' complaints about the decision to pause consideration of the course proposals were based on Dr. Raadschelders' belief that the decision was unfair rather than retaliatory. The question is whether a reasonable jury could find

12

otherwise. While Dr. Raadschelders claimed that Columbus State was treating Dr. Ng unfairly,

she also made the following statements in meetings where HR Rep. Klinger, Vice President

Cooley, Dean Todd, or Dean Schneider were present:

- "Dr. Ng had been to the Ohio Civil Rights Commission and would likely be seeking legal counsel." Pl.'s Dep., Ex. K at 2.

- To Vice President Cooley about his decision to wait and see about Dr. Ng's course assignment: "that's unacceptable, … [Dr. Ng] need[s] a permanent solution to her situation." Pl.'s Dep. Tr. at 49.

- "It's … very serious that [Dr. Ng] experienced harassment for two years in the Criminal Justice Department. That she was moved as a result of that harassment. And after being told she could develop these courses, she was then told she couldn't. And on top of that, that they retaliated against her by removing the Criminology course, thereby leaving her few courses to teach in our department." Pl.'s Dep. Tr. at 52.

- "[Dr. Ng] has been waiting … for four years now, and it [is] time to do right by her." Pl.'s Dep., Ex. K at 1.

These statements notified Columbus State that Dr. Raadschelders believed that Columbus

State's conduct was illegal. An employee who complains that the employer is retaliating against

another employee engages in Title VII protected activity when the context objectively reveals

that the employee is complaining about repeated abusive treatment. *Yazdian v. ConMed*

*Endoscopic Tech., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015). Here, a reasonable jury could find

that Dr. Raadschelders specifically referenced previous harassment and alleged ongoing

discrimination by Columbus State faculty against Dr. Ng. She also mentioned Dr. Ng's interests

in potentially suing the college. Construing all facts and making all reasonable inferences in Dr.

Raadschelders' favor, a jury could conclude that when Dr. Raadschelders criticized Columbus

State's actions toward Dr. Ng, she was protesting Columbus State's allegedly discriminatory

treatment. Therefore, to the extent Dr. Raadschelders criticized how Columbus State treated Dr.

Ng, she arguably engaged in protected activity.

**2. Direct Evidence of Retaliation**

"Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle*, 515 F.3d at 543–44. "If there is direct evidence of retaliation, then the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Daniels v. Pike Cnty. Comm'rs*, 706 Fed. Appx. 281, 291 (6th Cir. 2017) (citing *Yazdian*, 793 F.3d at 648). Dr. Raadschelders contends Dean Todd's statements after the April 25th meeting constitute direct evidence that proves Columbus State retaliated against her for engaging in protected activity.

After the April 25th meeting with Dr. Raadschelders, Dean Todd asked HR Rep. Klinger, "how can I work with someone, how can I trust someone when their personal opinion ... is in direct violation of what the college has decided?" Todd Dep. Tr. at 207. A jury could find that Dean Todd's belief that Dr. Raadschelders opposition to her plan was her concern that Dr. Ng's complaints of gender-based discrimination had not been addressed. Because Dean Todd justified firing Dr. Raadschelders for insubordination, which was arguably in part at least protected activity, Dr. Raadschelders has offered direct evidence from which a reasonable jury could conclude that Dean Todd believed Dr. Raadschelders' protected activity constituted insubordination, and therefore that Columbus State retaliatorily terminated her for engaging in protected activity.

The Sixth Circuit's decisions in *Yazdian* and *Daniels* support this conclusion. In *Daniels*, the Sixth Circuit unanimously reversed summary judgment on a retaliation claim because the plaintiff's supervisor claimed that the plaintiff was disloyal for engaging in protected activity and fired her on that basis. *Daniels*, 706 Fed. Appx. at 285. In that case, a prosecutor fired a

14

secretary after she reported that the prosecutor, while in the office, held an AR-15 rifle and said, "Don't worry. I'm not that mad, ha, ha, ha, ha." *Id*. The prosecutor later admitted that one of the reasons he fired the secretary was because "she proved to be 'disloyal' by making statements" about the incident and about the office atmosphere. *Id*. at 292. Although the prosecutor claimed that the secretary's attitude and constant arguing also contributed to the decision to terminate her employment, he conceded that he had no immediate plans to fire her before she made the statements. *Id*. The Sixth Circuit found that the secretary succeeded in offering direct evidence of retaliation, but only to the extent that the plaintiff's statements about the incident could be considered "protected activity." *Id*. at 292. Like *Daniels*, a reasonable jury could find that Dean Todd justified terminating Dr. Raadschelders for being untrustworthy since she protested an allegedly unlawful employment practice.

In *Yazdian*, the Sixth Circuit unanimously reversed summary judgment on a retaliation claim because the plaintiff had offered direct evidence that he was terminated for engaging in a protected activity. *Yazdian*, 793 F.3d at 648–49. The Sixth Circuit found that the plaintiff offered direct evidence through the employer's statements, which specifically referenced the plaintiff's protected activities as examples of his insubordination. *Id*. at 648. The employer told the plaintiff that he was insubordinate because of his "unwillingness to accept and apply constructive coaching." *Id*. The Sixth Circuit noted that "crucially," the supervisor decided to fire the plaintiff immediately after a phone call during which the plaintiff said that: he planned to file a lawsuit, he would respond to a warning letter with charges, and the supervisor had created a hostile work environment. *Id*. The supervisor, attempting to further justify his decision, explained that he was not optimistic about the plaintiff's ability to change based on the plaintiff's statements. *Id*. But the Sixth Circuit found that those statements were protected activity and

therefore constituted direct evidence from which a jury could conclude that the defendant fired the plaintiff in retaliation. *Id.*

"If there is direct evidence of retaliation, then the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Daniels*, 706 Fed. Appx. at 291 (quoting *Yazdian*, 793 F.3d at 648) (citations and quotation marks omitted). Columbus State asserts that it would have fired Dr. Raadschelders despite her protected activity because she refused to accept responsibility for her behavior, which constitutes insubordination and is a legitimate rationale for termination. *Fullen v. City of Columbus*, 514 Fed. Appx. 601, 606 (6th Cir. 2013) (citing *Russell v. Univ. of Toledo*, 534 F.3d 596, 604 (6th Cir. 2008); *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 Fed. Appx. at 340 (6th Cir. 2001) (holding that "documented insubordination constitutes a legitimate nondiscriminatory reason for ...firing.")). But to the extent that Dr. Raadschelders' other allegedly insubordinate actions were protected activity, as discussed *supra*, a reasonable jury could find that Columbus State has failed to prove by a preponderance of the evidence that it would have fired Dr. Raadschelders had she never threatened to hire an attorney or protested Columbus State's treatment of Dr. Ng. Accordingly, the Court **DENIES** Columbus State's *Motion for Summary Judgment* on Dr. Raadschelders' retaliation claim.

## B. Sex Discrimination under Titles VII and IX

Dr. Raadschelders asserts Columbus State violated Titles VII and IX by firing her because she is a female.[4] A plaintiff alleging sex discrimination may establish her claim "either

---

[4] The elements of discriminatory discharge under Title VII and Title IX are substantially similar. Therefore, the Court addresses these two claims concurrently. *See Nelson v. Christian Brothers Univ.*, 226 Fed. Appx. 448, 454 (6th Cir. 2007).

16

by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citation omitted). Dr. Raadschelders offers no direct evidence that she was fired due to her sex. Therefore, to succeed on her claims of wrongful termination, Dr. Raadschelders must seek to prove unlawful discrimination by circumstantial evidence utilizing the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 2017 (1981).

Under this framework, Dr. Raadschelders must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53 (citing *McDonnell Douglas*, 411 U.S. at 802). If Dr. Raadschelders can do so, the burden of production shifts to Columbus State to "articulate some legitimate, non-discriminatory reason for the [alleged adverse action]." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Dr. Raadschelders must then prove the reasons proffered by Columbus State were not true motivations for its actions but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

**1. *Prima Facie* Evidence of Sex Discrimination**

To establish a *prima facie* case of sex discrimination, Dr. Raadschelders must initially show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (citing *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995)). Columbus State concedes that Dr. Raadschelders has established the first three elements by introducing evidence that she

was a woman who was qualified for her job and was fired from that position. The parties disagree, however, over the fourth element: whether Columbus State replaced Dr. Raadschelders with a male, or whether similarly situated male employees were treated more favorably than Dr. Raadschelders.

Dr. Raadschelders argues that she was replaced by a male because Doug Gray, Chairman of the Communications Department ("Chairman Gray"), served in her role for about ten months immediately after she was fired.

Columbus State argues that Dr. Raadschelders was not replaced by a male because Columbus State has not yet filled Dr. Raadschelders' position. Columbus State contends that one is generally not replaced for purposes of a discrimination claim when other people already employed by the organization assume the terminated employee's responsibilities. But Columbus State relies on *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365 (6th Cir. 1999) and *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519 (6th Cir. 1997), both of which concern a reduction-in-force, where an employer discharges many employees at one time as opposed to only one employee. The replacement element is heightened in reduction-in-force cases. *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018). In the instant case, Columbus State terminated only Dr. Raadschelders. Therefore, this heightened requirement does not apply.

Next, Columbus State argues that Chairman Gray did not replace Dr. Raadschelders because employees hired on an interim basis generally are not considered replacements for purposes of establishing a Title VII discrimination claim. However, "[i]n cases where the new hire takes on the plaintiff's former job responsibilities, merely designating the new hire 'temporary' will not defeat the fourth element." *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 318 (6th Cir. 2007) (finding that, even under the heightened ADEA analysis, the

18

plaintiff satisfied the fourth element by establishing that a "temporary replacement" replaced the plaintiff). Moreover, to support its argument, Columbus State relies on *Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780 (S.D. Ohio 2002) (citing *Sheets v. National Computer Systems, Inc.*, No. 3-99-CV-30091, 2000 WL 33364120, at \*6–7 (S.D. Iowa Dec. 7, 2000); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989), *cert. denied*, 495 U.S. 935 (1990); *Ashagre v. The Southland Corp.*, 546 F. Supp. 1214, 1219 (S.D. Texas 1982)). In each of these cases, however, the courts were satisfied with the brief amounts of time it took the defendants to permanently hire or reassign the plaintiffs' replacements after firing the plaintiffs. *See Bush*, 227 F. Supp. 2d at 791 n.9 (one to two months); *Sheets*, 2000 WL 33364120, at \*6 (about a month); *Hawkins*, 883 F.2d at 984 (within two days); *Ashagre*, 546 F. Supp. at 1219 (two weeks); *see also Clevidence v. Wayne Savings Community Bank*, 143 F. Supp. 2d 901 (N.D. Ohio 2001) (defendant permanently replaced plaintiff by promoting co-worker a month later). Meanwhile, in the instant case, Columbus State fired Dr. Raadschelders three years ago.[5] Immediately after terminating Raadschelders, Columbus State assigned Chairman Gray to all of Dr. Raadschelders' job duties, which he performed for ten months. Viewing the record in the light most favorable to Dr. Raadschelders, a reasonable jury could find that Columbus State replaced Dr. Raadschelders with Chairman Gray. Thus, Dr. Raadschelders has established a *prima facie* case of sex discrimination.

**2. Pretext**

Once the plaintiff has made a *prima facie* case of discrimination, the employer must proffer a legitimate, nondiscriminatory reason for its employment decision. *Hamilton v. General*

---

[5] After firing Dr. Raadschelders on May 3, 2016, Columbus State reassigned Chairman Gray to serve in her position as Chair of the Social Sciences Department. He served as Chair for about ten months. In February of 2017, Chairman Gray resigned as Chair of the Social Sciences Department, and Columbus State assigned Dean Schneider to the position. In her deposition, Dean Schneider testified that Gary Piggrem is set to replace her for a year.

*Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). Columbus State asserts that it terminated Dr. Raadschelders for insubordination. The Sixth Circuit has repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action. *Fullen v. City of Columbus*, 514 Fed. Appx. 601, 606 (6th Cir. 2013) (citing *Russell v. Univ. of Toledo*, 534 F.3d 596, 604 (6th Cir. 2008); *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 Fed. Appx. 336, 340 (6th Cir. 2001) (holding that "documented insubordination constitutes a legitimate nondiscriminatory reason for …firing.")). Therefore, Columbus State has satisfied its burden of production. By providing a nonretaliatory reason as to the sex-based discrimination for its adverse action, Columbus State pushes the *McDonnell Douglas* framework into its third phase, where Dr. Raadschelders must demonstrate by a preponderance of the evidence that the proffered reason is pretext for unlawful discrimination. 411 U.S. at 802; *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

To carry her burden in opposing summary judgment, Dr. Raadschelders must produce sufficient evidence from which a jury could reasonably reject Columbus State's explanation of why it fired her. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). Under the law of our circuit, to demonstrate pretext—and thereby defeat Columbus State's Motion for Summary Judgment—Dr. Raadschelders may show that Columbus State's offered reason for her termination: (1) had no basis in fact; (2) did not actually motivate Columbus State's conduct; or (3) was insufficient to explain this conduct. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). Dr. Raadschelders asserts all three methods apply.

Dr. Raadschelders has not offered any evidence related to her <u>sex</u> discrimination claim from which a jury could reasonably reject Columbus State's explanation for firing her. Instead,

her claim of pretext involves her claim of retaliation, which the Court has addressed *supra*. Put more succinctly, she has shown enough for a jury to decide that she was fired in retaliation for her opposition to the school not following Title VII. She offers no evidence of pretext with regard to a claim that she was fired because of her sex. As discussed, a reasonable jury could find that Dr. Raadschelders resisted Columbus State's indifference to a claim of sexual harassment and that her opposition resulted in her discharge. But no evidence has been addressed that would allow a finding or inference that she was fired because of her sex rather than her opposition to a claimed Title VII violation.

Accordingly, the Court **GRANTS** Columbus State's *Motion for Summary Judgment* regarding Dr. Raadschelders' sex discrimination claim.

### IV.

For the reasons above, the Court **GRANTS in PART** and **DENIES in PART** Columbus State's *Motion for Summary Judgment*. (ECF No. 46). Accordingly, the Court **DISMISSES** Dr. Raadschelders' sex discrimination claims.

**IT IS SO ORDERED.**

5-2-2019
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**